SURVIVING EXECUTORS of JOHN JONES, deceased, who survived JOHN WELSH, which JOHN JONES and JOHN WELSH were executors of JOHN EVANS, deceased, for the use of the heirs and legal representatives of the said JOHN EVANS, deceased, Plaintiffs in error, *v.* HENRY MENGEL, Defendant in error.

It is error to leave to the jury to find a fact, when there is no evidence tending to prove it.

In debt upon bond, where the plea of payment, with leave, &c., is pleaded ; it is incumbent on the defendant to make out such a case as would entitle him to relief in a Court of Chancery.

If a bond-creditor negotiating with the principal debtor to obtain a *mortgage*, to insure the payment of a subsisting debt, assert, in reply to a demand of the sureties that the bond should be given up, and the sureties discharged, *that it makes no difference about the bonds,* such assertion is no evidence, to be submitted to the jury, of a discharge of the sureties.

Nor, in such case, is testimony admissible to prove, that after the mortgage was given, the land depreciated in value ; nor that the mortgagor had improved it, before a sale under the mortgage to the mortgagee.

THIS was an action of debt brought by the plaintiffs in error in the court below, to August term, 1832, to recover the amount of four joint and several bonds, dated September 15th, 1814, conditioned for the payment of £1200 each, with interest from the 1st of April, 1814, and payable 1st of April, 1816, 1817, 1818, and 1819, respectively, executed by John Mengel, Henry Mengel, and Francis Mengel, to

John Jones and John Welsh, executors of John Evans, late of Lancaster county, deceased.

The bonds were given by John Mengel, as principal debtor, with Henry Mengel and Francis Mengel as sureties, and formed part of the consideration of a tract of land in Lancaster county, sold to him by the executors of John Evans, deceased, no lien on the land conveyed having been taken to secure the payment of the balance of the purchase money.

In 1816, Edward Davies and Robert Jenkins were appointed by the Orphans' Court of Lancaster county, joint guardians of four of the minor children of John Evans, deceased, and Caleb Jones, guardian of the remaining two minor children of the said deceased.

The bonds on which the action is founded were placed by the executors in the hands of the said guardians, to be held by them in trust for their wards.

On the 17th of July, 1816, John Mengel executed to the said guardians a mortgage on that portion of the lands still owned by him, to secure the payment of these and other bonds given to the same executors; and it was contended by the defendant, that Edward Davies, one of the said guardians, on the said 17th day of July, 1816, in consideration of the execution of the said mortgage by the said John Mengel, agreed, that the bonds should be given up, and the sureties discharged from their liability to pay them.

To prove this allegation, the defendant examined Abraham Mengel as a witness, whose testimony, as given in the court below, is subjoined; and whether this testimony tended in any degree to the proof of a release, or agreement to discharge the bail in the said bonds, constitutes the principal point decided in this case by the court.

The court below also admitted evidence on the trial of the cause, to show the value and condition of the land sold to John Mengel at the time of the execution of the mortgage, and also on the 2d of August, 1821, when the residue of the land was sold by the sheriff of Lancaster county, on judgment obtained against John Mengel, which being assigned for error, constitutes the second point decided by the court in this case.

On a former trial of this cause, a verdict and judgment were obtained by the defendant in error, who was also the defendant below; but a writ of error having been taken, the judgment was reversed and a venire de novo awarded. 6 Watts, 72.

The cause being at issue on the plea of payment, with leave to give the special matter in evidence, came on *again* for trial on the 9th of

January, 1838, before Banks, president, when the plaintiffs gave in evidence the four bonds on which the action is founded, with the endorsements thereon, and rested.

The defendant then, to maintain the issue on his part, after giving in evidence certain deeds, records of the Orphans' Court of Lancaster county, the mortgage dated July 17th, 1816, from John Mengel to Robert Jenkins, Caleb Jones and Edward Davies, guardians of the minor children of John Evans, deceased, on two hundred and forty-one acres, one hundred and forty-three perches of land in Lancaster county, to secure the payment of £25,000, the amount recited in the mortgage bonds, and also exemplifications of records of the Court of Common Pleas of Lancaster county, called and examined Abraham Mengel, as a witness in the cause, who testified as follows:

Testimony of Abraham Mengel from Judge Banks' notes:

"I was present when mortgage was given. I was notified by Esquire Zell to meet the parties at John Mengel's. Francis Mengel, Henry Mengel, Edward Davies, Caleb Jones, and Esquire Zell were there, and myself. Mr. Davies took out a mortgage, asked John to sign it, wished him to sign it. John said if he would give up the bonds he would sign the mortgage. Davies refused doing it; talked matter; Davies still refused but wished John to sign the mortgage. Davies said it mattered little about the bonds. He wished to have the property as security for the heirs, as he thought the property worth the money and more. He said it was. By doing so it would place the bail in a better situation. Davies asked me to speak to John to get it done. He would not do it, unless Davies would give up the bonds. Davies said, it mattered little about the bonds—land always worth the money. At length Davies, Jones and Zell went off. Zell returned back, told me to tell John, if he did not sign the mortgage, he would sue the bonds; we consulted awhile and they were called back, talked matter over; finally we agreed John would sign the mortgage, provided judgment and bonds given up, something to that amount; we were to give up our judgment against John. Davies brought mortgage with him, read it to us. I entered satisfaction on the judgment. Davies drew power of attorney at John's, for Francis and Henry to sign. They did sign it. I went in a day or two and did enter satisfaction on the judgment. I was bail to John for £1000 for money he had borrowed. John satisfied me for part, by selling me bond on Henry Mengel. My property was sold to pay Mrs. Root. I sold bond to Esquire Zell, it was $1000. Mr. Davies said something about our judgment—can't recollect it. Mr. Zell very active to get John to sign the mortgage, as much so as Davies. His

influence got it done.   He is Davies' step-father.   Zell is married to Jones' sister.   Did not see bonds there.   Davies had nothing but the mortgage.   John dead nine, Caleb Jones twelve years."

Cross-examined.

" John had no other property.  Don't recollect of getting another bond from John and selling it to Good.   Sold one to Jesse Lafferty.   Henry had bought John's land ; these bonds for the payment.   I do not recollect of any thing being said about Francis and Henry being in debt to John on the day of the mortgage.    The judgment was to secure me for £1000, and to secure Henry and Francis for their going John's security. Davies said the judgment was to secure John from Isaac's creditors, as John had bailed Isaac.   Davies did not say he would give up the bonds ; said it made no difference whether he did or not, that it made no difference about the bonds."

And also examined Stephen Kauffman as a witness, who being affirmed, testified as follows, viz. :

" I am very well acquainted with the property John bought of Evans' executors.   I have lived there thirty odd years.   He was well stocked ; hard to tell what it was worth in 1816 ; it had not fallen much then from 1813 ; it is very hard to tell what it was worth when it was taken from Mengel ; it was better improved that when he got it. I think the price had fallen in 1820.   Personal property sold by the sheriff in 1816."

And being cross-examined, he testified as follows, to wit :

" It was several years after they had taken the mortgage that the personal property was sold.   I do not know of any sale to Peter. Francis got fifty-eight acres and the mill.   Can't say how much he paid for it.   Can't tell when Francis went to live there."

To the admission of which testimony of the said witness, the plaintiffs by their counsel then and there objected as illegal and irrelevant, but the court overruled their objection and admitted the evidence, whereupon the said plaintiffs by their counsel excepted to the admission of the said testimony.

And the said defendant also examined James De Haven as a witness, who being sworn, testified as follows, viz. :

" When it was taken from Johnny Mengel it was lower than when he bought.   It was in better order.   He had limed it a great deal."

And also examined James Everhart, Esq., as a witness, who testified as follows, viz. :

" Property depreciated from 1816 to 1821 in that neighbourhood.  I live six or seven miles off."

To the admission of which testimony of the said James De Haven

and James Everhart, the plaintiffs by their counsel did then and there object as illegal and irrelevant, but the said court overruled their said objection and admitted the said testimony, whereupon the said plaintiffs, by their counsel, excepted to the admission of the same. When the said defendants rested.

The plaintiffs then read in evidence the deposition of Edward Davies duly taken in the cause, in the following words, to wit:

"On the day of the date of the mortgage from John Mengel to the guardians of the children of John Evans, deceased, I called at the house of John Mengel with John Zell, Esq. I found there John Mengel, Henry Mengel, Francis Mengel, and Abraham Mengel. When we went in I produced the mortgage, which I had prepared before I started, and asked John Mengel to sign it, and the brothers objected, alleging that it would make their situation worse than it then stood, and said they had a judgment bond against their brother John to secure them as his bail. I told them I thought this would be a better security for them, for it would be for a good consideration, and that the consideration of their bond, I considered, as far as it respected Francis and Henry, was not good, as it was admitted then that they were both indebted to John Mengel. Francis Mengel had received of his brother John about fifty acres of land and a mill, and Henry Mengel was indebted to his brother John for land in Berks county. I don't know how much he was indebted, or how much land he got. We talked to them a long time, Esquire Zell and myself, to induce them to permit John to sign the mortgage, and they would not agree to it. Esquire Zell and myself then came out of the house, the others following, and Esquire Zell and I got on our horses to come away. I then told the Esquire to tell Abraham, I think it was, that suit should be brought against them the next day on the bonds which were due against John, Henry, and Francis. They finally agreed that John should sign the mortgage. They were all present in the yard, within hearing distance, when I told Esquire Zell to tell Abraham this. We went into the house again and John signed the mortgage, and there was a power of attorney drawn up, for Abraham to enter satisfaction on the judgment bond in Lancaster county. I drew it up there, on the bond given by John to Abraham, Henry and Francis. I did not know what amount Abraham had on the bond. Abraham told me that he would get John to give him one of Henry's bonds for what he owed him. Robert Jenkins and Caleb Jones were my co-guardians. Mr. Jenkins and myself were guardians for the younger children of John Evans, deceased, and Caleb Jones for Reese and David Evans. Mr. Jenkins was not at John Mengel's that day while I was there, nor was Caleb Jones

while I was there. It was at the instance of Mr. Caleb Jones that the sureties met there that day. There were no other persons present there that day in the room with us, than those I have named. I think the sureties asked that the bonds might be given up. I told them the bonds were all recited in the mortgage, and could not be given up. I mean the bonds given by John, Henry, and Francis Mengel to the executors of John Evans's estate, which had been handed over to us as guardians. I think Caleb Jones had them first, and handed them over to me. Mr. Jenkins never took an active part. They were the same bonds on a part of which the present suits are brought. I told them that the bonds could not be given up, that they were recited in the mortgage, and that it was taken as a further security for their payment. I told them their situation would be bettered by the mortgage, for that then, John's property would have to be taken first, and that they would be accountable only for the balance, if there should be any. Caleb Jones knew that I had drawn the mortgage. It was agreed between us that I should meet the Mengel's at John Mengel's, to get the mortgage signed, and he would notify the bail. I never gave the bail the least intimation of a release. I never entered into any agreement with John, or the bail, or any of them, to release or discharge any of them. I never gave John any time to pay the bonds. The time of payment was never extended. I was present at Fricker's, in Reading, when suits on some of these bonds were tried before arbitrators. I think it was in 1820. Abraham Mengel was examined there as a witness. He did not say that Caleb Jones was present at John Mengel's, when the mortgage was given. I have a copy of the notes of the testimony taken at that trial at Fricker's, taken by Mr. Biddle. I got them not long after the trial. Mr. Biddle gave them to me at my request. I remember that Abraham Mengel did not say on that trial, that Caleb Jones was present when the mortgage was taken; and on referring to these notes lately, I find that he did not say that Caleb Jones was present. There was not a word ever passed between Caleb Jones and me, as it regarded releasing the sureties in John Mengel's bonds."

The above extract contains all of the deposition that is material.

The plaintiff then gave in evidence the guardianship account of Edward Davies, filed in the Register's office of Lancaster county, May 14, 1821.

And also, the record of the discharge of Edward Davies, as guardian, in June, 1820.

From a mass of parol and record evidence given in the court below,

on the trial of this cause, the reporter has selected only such parts thereof as he considered material to the questions decided in this court.

The court were then requested by the plaintiff's counsel to charge the jury as follows:

1. That the bonds on which this suit is brought, were for the use of the heirs and legal representatives of John Evans, deceased.

2. That Margaret Evans, afterwards married to Dieter Bechtel, was the widow of the said John Evans, deceased, and was entitled to one-third part of the interest accruing on the said bonds during her life.

3. That Reese Evans, David Evans, John C. Evans, Nathan Evans, Anne Evans, and George W. Evans, children of the said John Evans, deceased, were entitled to two-third parts of the principal of said bonds, and the interest thereon accruing, during the lifetime of their mother, the said Margaret, and to the whole of the principal of the said bonds, and the interest thereon accruing, after her death.

4. That the legal representatives of the said Margaret Bechtel, deceased, are now entitled to one-third part of the interest which accrued during her life on the said bonds, which remains unpaid; and Reese, David, John C., Nathan, and George W. Evans, who survived Anne Evans, deceased, are now entitled to the whole of the principal of the said bonds, with two-thirds of the interest which accrued during the lifetime of their mother, and all the interest which has accrued since her death.

5. That no compromise or agreement to release Henry Mengel, the defendant in this action, from any liability as one of the obligors in the said bonds, by any one or more of the heirs or legal representatives, or by his, her, or their guardian or guardians, is binding on any heir or legal representative not a party to the said release or agreement, or affects his or her interest in the said bonds in any manner, so as to discharge the said defendant from his liability to the said heirs and legal representatives.

6. That joint guardians must join in any act discharging an obligor from his liability to pay money due on bond, the property of their wards; and Robert Jenkins and Edward Davies being the joint guardians of John C. Evans, Nathan Evans, Anne Evans, and George W. Evans, no act of Edward Davies alone, discharging the said defendant from his liability to pay the amount due on the bonds on which this suit is brought, is binding on the said wards, or operates as a discharge of the said defendant from his said liability.

7. That there is no evidence that Margaret, the widow of the said John Evans, deceased, or her legal representatives, by any act whatever, released the said defendant from his liability to pay the said

bonds, and, therefore, the verdict must be for the plaintiffs, for the amount of her interest in the said bonds.

8. That there is no evidence that Reese Evans and David Evans, either by themselves or guardian, released the said defendant from his liability to pay the said bonds, and, therefore, the verdict must be for the plaintiffs, for the amount of the interest of the said Reese and David in the said bonds.

9. That if the jury should be of opinion that Edward Davies, by his acts, intended to release the said defendant from his liability, yet he being only one of two joint guardians, his acts were not binding on his wards, and the verdict should be for the plaintiffs for the amount of the debt and interest due on the said bonds.

10. That if all the guardians had joined in a release of the said defendant, from the said bonds, it would not bind their wards, and the verdict should be for the plaintiffs.

11. That if the jury believe all the evidence given on the part of the defendant, it does not in law amount to a release or discharge of Henry Mengel, and prevent the plaintiffs from recovering in this action.

12. That if Edward Davies did do, or say any thing at the time the mortgage was given, tending to discharge Henry Mengel and Francis Mengel from their liabilities in the bonds now in suit, there is no evidence that the other guardians ever had notice of such act or declaration; and full knowledge of all his acts and deeds must have been communicated to them before any thing they may have done can be held a ratification.

13. That if the jury believe all the evidence given in the cause, it does not in law amount to a release or discharge of Henry Mengel, and prevent the plaintiffs recovering in this suit.

The court (Banks, President) charged the jury as follows:

"By deed, dated the 15th of September, 1814, the executors of John Evans, deceased, sold unto John Mengel a tract of land, situate in Lancaster county, containing three hundred and seventy-four acres and seventy-three perches, for the sum of $61,435 77.

"The bonds, to recover which this suit is brought, were given to secure part of the consideration money to be paid by John Mengel for said land.

"Henry Mengel and Francis Mengel were the sureties of John, in said bonds. These facts are not disputed. The defendant admits the execution of the bonds, and his original liability to pay them. He does not pretend that the whole amount of the bonds has been paid by him, or any other person. It is therefore incumbent on him to show, to your satisfaction, some legal or equitable reason, why he ought not to pay

the amount that is yet unpaid on the bonds. If he has failed to do this, then your verdict must be against him. His liability originally having been admitted, he must show a release or exoneration from that liability. His defence consists in an attempt to establish this, and whether he has been successful in this attempt is the matter now controverted.

"John Evans left a widow. and six children. His children were all minors at the death of their father, and at the time said lands were sold, and the bonds now in suit were taken.

"Caleb Jones was the guardian of Reese Evans and David Evans; Edward Davies and Robert Jenkins were the guardians of John Evans, Nathan Evans, Anne Evans, and George Evans; said guardians were all appointed prior to the month of July, 1816.

"Abraham Mengel, Henry Mengel, and Francis Mengel took judgment bond from, and on, John Mengel for £27,850, and had judgment entered upon it in the Court of Common Pleas of Lancaster county, in the month of April, 1816. This judgment was to indemnify Abraham for his having become surety for John for a debt of £1000, and to indemnify Henry and Francis for their having become his sureties for the money he was to pay Evans's executors for said tract of land.

"On the 17th of July, 1816, John Mengel gave a mortgage to the guardians of the children of John Evans, deceased, on two hundred and forty-one acres one hundred and twenty-three perches of land, it being part of the land he had purchased from Evans's executors. This mortgage was given to secure the payment of $33,333 33, a part of the purchase money due by him on said purchase.

"It appears to be conceded by the counsel on all sides on this trial, that this was the entire amount of purchase money that then remained unpaid. If this is correct, and it has been so taken by the counsel, John Mengel had then paid of the purchase money, about $28,102 44, leaving the sum then due for which this mortgage was taken.

"Suits were brought against John Mengel in Lancaster county on some of the bonds which he had originally given for the purchase money, with his brothers as security. In one suit, judgment was obtained against John for $14,133 33, and in the other, $11,072 29. Both judgments were obtained on the 9th of May, 1820.

"The mortgage lands were levied upon and sold on these judgments, in August, 1821, to the plaintiffs or some of them, for $10,800.

"These two suits were brought for the use of the heirs of John Evans, deceased. The whole contest arises out of what was done, when the mortgage was given on the 17th of July, 1816. It is therefore necessary for the court, and for you, to know what was done at that time, and to determine what may be the effect of what was done by the parties.

" The defence set up is an equitable one. Equity may compel parties to perform their agreements when fairly made, and fully proved, according to the terms stipulated between them. We disclaim all power, first to make agreements for the parties, and then to compel their execution by them.

" We have the legitimate power only to ascertain and determine what agreement the parties have made between them, and to hold them to the fair execution of such agreement, if it has been proved that any such was made."

The testimony of Abraham Mengel and Edward Davies, as stated here by the learned judge, omitted; it having been noted in the statement of the case.

" These two witnesses do not agree in their testimony. Part of it cannot very well be reconciled. If you can consistently reconcile it, you will do so. If you cannot, you must decide which of them you will believe.

" It is admitted, that they are both men of good character and high standing in society. It is contended that they have varied in some material points, from what they testified on former trials of this dispute. This charge was made against each of them by the party against whom the testimony of each is brought to bear. That a witness will vary some, in his narration of a transaction, after the lapse of twenty years, is to be expected. And it would be a matter to be wondered at, if a witness could, after that lapse of time, having been examined four or five times by different counsel, and the case bearing a different aspect at each trial, and cross-examined as many different times, tell exactly the same things. At one time a question may be asked of the witness, which was omitted at another. The attention of a witness may at one time be drawn to a particular fact, and not at another. This will necessarily make some difference in his testimony. You know how to estimate this matter when you come to judge of the contradictions of the witnesses, by their own testimony as given at different trials.

" On the one side it is urged, that Abraham Mengel is the brother of the defendant. This is true in point of fact. The relationship of a witness to one of the parties, is a circumstance to which a jury will always give its due weight, when considering his testimony which makes for the interest of his relation. In weighing the testimony of Abraham Mengel, you will make all due allowance for his feelings in favour of his brother, and determine in what degree it ought to demand your reliance upon it, either in whole or in part.

" On the other side it is said, that Davies was a party to the arrangements, and may have feelings in favour of the plaintiffs. The circum-

stances in which a witness stands in regard to the matter about which he testifies, is also a matter worthy of the consideration of the jury. A witness may stand in such relation to the transaction, as to generate a strong bias on his mind. You know the relation in which Davies stands as to the transaction, and whether he has any feelings, and what degree, in favour of the interest that he was then acting for and endeavouring to secure, is a matter entirely for your decision. The credit that is due to the. witnesses is a subject which most appropriately belongs to you.

"It would be with reluctance that I would invade the province of a jury on a question of ˙credibility in any case, and more especially in this case. I refrain from even intimating an opinion, as to which is the witness of credit. You will then exercise your own judgment·on this point.

"If you believe the testimony of Mr. Davies, the defence would totally fail, and your verdict must be for the plaintiffs.

"If you do not believe Mr. Davies, and believe Mr. Mengel, you must then determine what the arrangement was, as has been testified to by him.

"This case has been once in the Supreme Court, and it was then decided that the Common Pleas erred in submitting it as a question of fact for the jury to determine, whether the defendant was released or not. This decision was made on the evidence as given on that trial. If the evidence was the same now that it was on that trial, there would be no fact for you to try, and we would not submit the question of release or exoneration of the defendant for your consideration. It appears to me that the testimony given now is very different, and much stronger than it was in the former trial, as far as I can gather it from the report of the case in this point. Mengel now testifies, that after Davies and the others came back, that they talked the matter all over, and gives as the conclusion of that conversation, that we, that is the sureties, agreed that John should sign the mortgage ; that the sureties would give up their judgment, provided Davies would give up the bonds. He says this was finally agreed by the sureties. He also testifies that Davies did not say that he would give up the bonds, but that he did say that it made no difference whether he did or not; that it made no difference about them. If Davies did say, when he was asked to give up the bonds, that it made no difference whether he did or not, what would the sureties understand by that expression ? How can the defendant have the benefit of the assurance that Davies gave him, that it made no difference whether the bonds were given up or not ? In no other way, than by treating the bonds as given up, so far as regards him. It made no difference whether the bonds were given up or not,

if the defendant was not called upon, or held liable to pay any money upon them; but it would make a very great difference to him, if he was still held liable to pay the money. This very difference is what the defendant wished to obviate, by having the bonds given up; to treat the sureties as if the bonds were given up, is the only way to make good to them Davies's assertion, that it made no difference whether they were given up or not. What else could Davies mean by this expression? It is not necessary, to exonerate sureties, that the word release, or exonerate, should be used. Any words which show that to have been the intention of the parties, will be sufficient for that purpose. This intent is to be determined from what the parties mutually *agreed upon*. What then did the parties say, and agree upon, and do at the time? In determining upon their intention, you will adopt the plain, ordinary, common sense meaning of the terms employed by them in making their agreement. It is for you to say what the agreement was. If you believe that Davies said, when urged to give up the bonds, that it made no difference whether he gave up the bonds or not, and that relying on this, John signed the mortgage, and the sureties entered satisfaction on their judgment, it would tend to prove that Davies had exonerated the sureties, and would be evidence from which you might infer that he had exonerated them. Henry had a judgment against John to indemnify him against this liability. This judgment, with the consent of his co-plaintiffs, he might have used at any time. He would have had a right to have the land sold, and the money raised to have paid the debt, for which he was liable. He would have had a right to have superintended the sale, so far as to have prevented the sacrifice of the land. These were rights which were valuable to him, and part of them he gave up when he entered satisfaction on his judgment. This was done by him in pursuance of this agreement.

"If you believe that Davies, at the time of the agreement, said, as testified by Mengel, that the land was worth the money, that it was the land which he wanted as security; this would strengthen the probability, that the intention was, that the sureties were to be exonerated, and the land taken as, and supposed to be, an ample security for the payment of the debt. To conclude: If you believe that Davies said, at the time the agreement was made, as testified to by Mengel, that the land was always good for the money; that it was that which he wanted for security; that it made no difference whether he gave up the bonds or not; that it made no difference about the bonds, and that relying upon this, John signed the mortgage, and the sureties caused their judgment to be satisfied: this would be evidence from which you might infer that Davies had exonerated the defendant. If

you do make that inference from the testimony, your verdict will be for the defendant. But if you believe the testimony of Davies, then your verdict will be for the plaintiff, for the amount due on the bonds, on which this suit is brought.

" The court now answers the points on which they are requested to charge you, as follows:

" The 1st, 2d, 3d and 4th points are assented to, and the court charge you, as it is requested to do, in said points.

" 5th point. This is correct, as a general principle, but in its application to the facts and circumstances of this case, requires some explanation. It is for the jury to decide from the evidence, what agreement, if any, was made, and who were present, and the parties to it. The jury will also decide the terms, conditions, and extent of the agreement. It will also be recollected, that the Mengels were induced by said agreement to enter satisfaction on their judgment, which, as a lien on the mortgage land, had a priority over any lien which the guardians had thereon. The guardians by this arrangement procured the first lien. They united in claiming and taking the benefit of this advantage for their wards, on the sheriff's sale of the mortgaged lands, and in the appropriation of the money raised thereby, in discharge of the debt due them, in right of their wards. Their wards received the benefits of this arrangement, and are bound by its terms and conditions. This question was so decided by the Supreme Court in their decision of this case.

" The 6th point is fully answered by the answer just given to the 5th point.

" 7th point. It has been testified in the cause, that the widow, who was an executrix of the will of her husband, gave, or permitted the bonds to be given to the guardians. Mr. Davies, who was one of the guardians, testifies that he received these bonds for the use of the heirs. If this is true, then the guardians had the management of the bonds under their control and care, with and by the consent of the widow. They might have received the money due on them, and receipted for the same, and given the bonds up. They might have sold the bonds, and received their amount as a consideration for the transfer of the bonds, and payment to the assignee would have discharged the obligations. If the guardians then holding the bonds did any thing that would exonerate or discharge the defendant from his liability to pay; that is, if they made any arrangement or agreement to exonerate or discharge the defendant from his liability to pay the bonds, then the plaintiffs would not be entitled to recover the amount of her interest in said bonds, unless you are satisfied that such arrangement or agree-

ment was made; then the plaintiffs would be entitled to recover, not only the widow's interest in the bonds, but the whole amount due thereon.

" The 8th and 9th points are fully answered, by the answer already given to the 5th point.

" 10th point.   If all the guardians had joined in a release of the defendant from said bonds, for a valuable consideration, it would bind their wards, and in that case the verdict should not be for the plaintiffs.

" 11th point.   If you believe the testimony of Abraham Mengel, you may infer a release, or discharge of the defendant from his liability on said bonds; and in case you do infer such release or discharge, then the plaintiffs would not be entitled to a verdict.

" 12th point.   Whether Edward Davies did any thing, and what, and whether the other guardians had notice of what Davies did do, are facts for you to decide.   It appears that suits were brought on some of these bonds, by the guardians, and tried in 1820 and 1821, in which the defence that is now made, was then made on the trials.   The guardians were parties on the record; some of them were present at those trials.   It does not appear that all were present.   You will decide who were present, and what notice they had, if any.   It was after this trial, or these trials, that they received the money on the sheriff's sale of the mortgaged lands.   If the other guardians had not full knowledge of what Davies had done, their taking the money at the sheriff's sale would not be a ratification of his acts and deeds.

" 13th point.   If the jury believe Abraham Mengel, and infer from his testimony a discharge or exoneration of the defendant from his liability on the bonds, then they may return a verdict for the defendant.   But if you do not believe Mengel, but believe Davies, then your verdict will be for the plaintiffs.   But if you believe both Mengel and Davies, and what they both have said in evidence in the cause, it would be difficult to say what your verdict should be.   I presume, however, that the plaintiffs' counsel did not intend, in these points, to present the case in this aspect."

To this charge the plaintiffs' counsel excepted.   The jury rendered a verdict in favour of the defendant, and the plaintiff sued out this writ of error.

The following errors were assigned:

1. The court erred in admitting the evidence mentioned in the first two bills of exception.

2. In their answer to the plaintiffs' 5th and 6th, and 8th and 9th points.

3. In their answer to the plaintiffs' *seventh* point.

4. In their answer to the plaintiffs' *eleventh* point.

5. In their answer to the plaintiffs' *twelfth* point.
6. In their answer to the plaintiff's *thirteenth* point.
7. In their charge to the jury generally.

*Strong* and *Gordon*, for plaintiffs in error.
*Smith* and *Darling*, for defendant in error.

The opinion of the court was delivered by Rogers, J.

This was an action of debt, to recover the amount of four joint and several bonds, given in part consideration of a tract of land ; by John Mengel, who was principal, and Henry Mengel and Francis Mengel, sureties, to John Jones and John Welsh, executors of John Evans, deceased.

The cause was tried under the plea of payment, with leave to give the special matter in evidence. Under that plea, which is in the nature of a bill in equity, the defendant insists he is entitled to relief, because, as he contends, on the 17th day of June, 1816, in consideration that John Mengel would execute a mortgage of that date, the guardians of the minor children of John Evans (to whom the land had been assigned) released or discharged the obligors. On the defendant is thrown the burden of proving the issue, and if he has shown that the guardians agreed to exonerate the obligors for the consideration stated, it is undoubtedly a discharge in equity from all liability on his part: whether he has succeeded is the only point in issue. The other points which were raised on the trial are subsidiary to this question. The same case was before this court on a former occasion, and reported in 6 Watts, 72. We were then of opinion, that there was no evidence given, tending to show that the guardians, or any of them, had agreed to give up the bonds, or to exonerate the sureties. For this reason, we reversed the judgment, and ordered the cause to be remanded for a new trial. It now comes before us again on the testimony of the same witnesses, and, in our opinion, with no substantial variation in the evidence. The defendant's case depends solely on the testimony of one witness, Abraham Mengel; for unless he proves a contract, the defence altogether fails. For it must be conceded, that Edward Davies, a witness examined on the part of the plaintiff, and who, it is alleged, made the agreement, expressly swears, that he told Mengel and the sureties, in answer to their proposition to that effect, that he could not release them from the payment of the bonds. The question therefore is, whether, admitting the truth of Mengel's testimony, and all the inferences that can be legitimately drawn from it, the defendant has any defence ; or, in other words, is it in proof from this, or any other

source, that there was a binding contract between the parties, that the payment of the bonds should not be enforced. That the bonds were delivered up, or that there was an express agreement to surrender them, will not be pretended. The testimony is, that the obligors, and particularly the sureties, as a consideration for the execution of the mortgage, were very desirous that they should be surrendered; but Mr. Davies, who was the acting guardian, constantly and steadily refused to accede to their request, and for reasons perfectly satisfactory, and which he assigned at the time. After negotiating for some time without coming to any result, Davies left the house with a determination, which was communicated to the obligors, of commencing suit immediately on the bonds. It was not until then, that the sureties consented, that John, who was the principal, should execute the mortgage, and the inference from the whole case is irresistible, that it was the fear of this consequence, and not any promise to relinquish any other remedy in their hands, that induced them to come into his terms. Such was the opinion of this court, when the case was before us on a former occasion, and we see nothing now to induce us to change or vary it, in the slightest degree. And this would seem to be the impression of the learned judge, before whom the cause was last tried. He puts the case, as I understand him, upon what he considers a new and distinct ground, the disclosure of evidence which did not exist on the former trial. I allude to the expressions used by Davies, after his return to the house, and about the time of the conclusion of the arrangement. Mr. Davies then said, that it made no difference whether he gave up the bonds or not; that the land was worth the money. If the jury believe, say the court, that Davies said, when urged to give up the bonds, that it made no difference whether he gave up the bonds or not, and that relying on this, John signed the mortgage, and the sureties entered satisfaction on their judgment, it would tend to prove, that Davies exonerated the sureties, and would be evidence from which the jury might infer that he had exonerated them. From this instruction we entirely dissent. How these expressions, however understood by the parties to whom they were addressed, can prove an agreement to deliver up or release the obligors, in the face of an express refusal to come into any such arrangement, we find some difficulty to understand. We must take the whole transaction together, and give words their obvious import, and from these it is impossible to say, that Mr. Davies gave the obligors any assurance, or entered into any engagement, as the court more than intimate to the jury, that he would not resort, if necessary, to suit on the bonds, to enforce the payment of the debt due. What does it amount to, but the expression of an opinion,

(we are bound to believe honestly entertained,) that it was of little consequence whether the bonds were given up or not; that the land about to be mortgaged was worth as much, or more than the debt due. But of this the obligors were as competent to judge as he was, and supposing it to be a mutual mistake, it can furnish no defence legal or equitable to the defendant. If it had been a matter peculiarly within the knowledge of Mr. Davies, they would have a right to complain; but granting it to be the mistake of both, neither can derive any advantage from it. It is very probable Mr. Davies was at the time under that impression, and so said, as an inducement to give the mortgage; but in this we see nothing wrong: indeed, it is very probable, that no loss would have arisen to either party, if the land had not unfortunately depreciated very much in value. This is the unforeseen cause of the whole difficulty, and no doubt has given rise to this controversy. The question does not depend upon what the obligors may have thought of it at the time, for of this we cannot judge, as we cannot dive into the recesses of their hearts; our attention must be directed solely to the contract of the parties. It is very certain, that they had no right to think that Mr. Davies intended to release them, when he told them in words which it was difficult to misunderstand, that such was not his intention. If they actually imbibed that impression, which it is difficult to believe, it is not the fault of Mr. Davies; the loss, if any, arises from their own folly. Fraud has not been imputed to the guardian, nor can it be, with the least colour of reason. View the transaction as it is presented by the evidence, and it amounts to this: Mr. Davies, acting for minors, was desirous of procuring real security for a debt justly due. This the defendants were unwilling to give, unless on terms which the guardian conceived to be inadmissible. In the course of a protracted negotiation, Mr. Davies used such arguments as he supposed would bring about the desired arrangement, and, amongst others, made light of a demand, which the other deemed of great importance, suggesting, and very likely believing, that the land proposed to be mortgaged, was worth the money due. Finding, however, these arguments ineffectual, he threatens to commence suit, and, finally, it is agreed to execute the mortgage, without conditions. In the course of his testimony, Mengel, after giving an account of the attempt at an arrangement, says: "At length, Davis, Jones, and Zell, went off. Zell returned back, told me to tell John, if he did not sign the mortgage, he would sue the bonds. We consulted awhile, and they were called back, talked the matter over; finally, we agreed John would sign the mortgage, provided judgment and bonds were given up, something to that amount. We were to give up our judgment against John." The

counsel contend, that when he says, "we agreed John would sign, provided judgment and bonds were given up;" he meant to include Mr. Davies, asserting, that all agreed to this arrangement. We do not think the words will admit of this construction, and such was the opinion of Judge Banks, who understood the witness as referring to the obligors only, and not to Mr. Davies. And this is rendered certain by another part of the testimony, for on his cross-examination, he distinctly admits, that Davies did not say, he would give up the bonds; "said it made no difference whether he did or not; that it made no difference about the bonds." It then appears uniformly, whenever Davies is pressed to accede to their terms, he evades doing so, expressing an opinion, that it was useless to insist upon it, that it was not of the importance they seemed disposed to attach to it. On the whole testimony, we are of the opinion, that no case has been proved in which a Chancellor would relieve the defendant, as there is no evidence which even tends to prove any contract whatever to release, or in any way discharge the obligors. To cut a party loose from his contract on such evidence, would be a most dangerous precedent, as it is without precedent in a court of equity.

We also think the evidence contained in the first and second bills was improperly received. Its only effect was to create a prejudice in the minds of the jury, by proving that the property was in a better condition, when it returned into the possession of the plaintiffs, than it was when purchased from the executors. We cannot perceive its pertinency to the issue.

In other respects we perceive no error, as the court seems to have conformed to the decision of this court, in the same case, as reported, Evans *v.* Mengel, 6 Watts, 72.

Judgment reversed, and a venire de novo awarded.